IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

TIDEWATER BARGE LINES, INC.,
as demise owner of the barge BIG BIN,

          Plaintiff,

In a cause for exoneration from or
limitation of liability.

Case No.  03-CV-1225-ST

CP SHIPS, LTD., ITALIA di
NAVIGAZIONE, S.p.A, CONTSHIP
CONTAINER LINES, LTD.,
AUSTRALIA-NEW ZEALAND DIRECT
LINES, and TMM LINES, LTD.,

          Claimants/Third-Party
          Plaintiffs,
   v.

THE PORT OF LEWISTON, an Idaho
municipal corporation,

          Third-Party Defendant,

     and

FINDINGS AND
RECOMMENDATION

THE PORT OF PORTLAND, an Oregon municipal
corporation, and MARINE TERMINALS
CORPORATION, a Nevada corporation,

                Claimants/Third-Party
                Defendants.

———————————————————————

THE PORT OF PORTLAND, an Oregon
municipal corporation, and MARINE
TERMINALS CORPORATION, a Nevada
corporation,

                Third-Party Defendants/
                Fourth-Party Plaintiffs,

    v.

SANDRA K. RUSSELL, as owner of the
barge BIG BIN,

                Fourth-Party Defendant.


STEWART, Magistrate Judge:

## **INTRODUCTION**

On March 28, 2003, a barge named BIG BIN capsized at its berth at the Port of Portland

during container discharge operations, causing the loss of cargo and other damage. Plaintiff,

Tidewater Barge Lines ("Tidewater"), was the charterer and operator of the BIG BIN at the time.

Pursuant to 46 USC App §§ 183-195 and Supplemental Rule F of the Supplemental Rules for

Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure, Tidewater

seeks exoneration from or limitation of liability for the losses caused by the capsizing of BIG

BIN.

Opposing Tidewater are numerous claimants seeking recompense for the losses they suffered to their interests in the BIG BIN's cargo. Those claimants sued the Port of Portland and Marine Terminals Corporation ("MTC"), who also filed a claim against Tidewater. Tidewater counterclaimed against the Port of Portland and MTC for indemnity and contribution for the damages claimed by the owners and insurers of the cargo and by the ocean carrier of the cargo, as well as the cost to raise and repair the BIG BIN, due to the negligence of the Port of Portland and MTC.

In turn, the Port of Portland and MTC filed a Fourth-Party Complaint against Sandra K. Russell, the owner of BIG BIN, seeking contribution as to any damage, without limitation of liability, for which the Port of Portland and MTC might be liable to Tidewater. The Port of Portland and MTC allege that the BIG BIN was unseaworthy in several respects. Sandra K. Russell tendered defense of this contribution claim to Tidewater which Tidewater has accepted.

Sandra K. Russell moves for summary judgment against the Fourth-Party Complaint (docket #136). Because she could not, under any circumstances, be liable to Tidewater for the alleged unseaworthiness of the BIG BIN, she contends that she cannot be held liable for contribution to the Port of Portland and MTC for any damages suffered by Tidewater as a result of the alleged negligence of the Port of Portland and MTC. Because Sandra K. Russell submitted with her Reply new facts concerning pre-1996 charters with Tidewater, the Port of Portland and MTC orally moved under FRCP 56(f) for a continuance to take additional discovery.

For the reasons set forth below, the motion for summary judgment by Sandra K. Russell should be granted.

///

///

///

## STANDARD

FRCP 56(c) authorizes summary judgment if "no genuine issue" exists regarding any material fact and "the moving party is entitled to judgment as a matter of law." The moving party must show an absence of an issue of material fact. *Celotex Corp. v. Catrett*, 477 US 317, 323 (1986). Once the moving party does so, the nonmoving party must "go beyond the pleadings" and designate specific facts showing a "genuine issue for trial." *Id* at 324, citing FRCP 56(e). The court must "not weigh the evidence or determine the truth of the matter, but only determines whether there is a genuine issue for trial." *Balint v. Carson City*, 180 F3d 1047, 1054 (9th Cir 1999) (citation omitted). A "'*scintilla* of evidence,' or evidence that is 'merely colorable' or 'not significantly probative,'" does not present a genuine issue of material fact. *United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F2d 1539, 1542 (9th Cir), *cert denied*, 493 US 809 (1989) (emphasis in original) (citation omitted).

The substantive law governing a claim or defense determines whether a fact is material. *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F2d 626, 631 (9th Cir 1987). The court must view the inferences drawn from the facts "in the light most favorable to the nonmoving party." *Id* (citation omitted). Thus, reasonable doubts about the existence of a factual issue should be resolved against the moving party. *Id* at 631.

## UNDISPUTED MATERIAL FACTS

Sandra K. Russell married Lewis S. Russell, Jr. in 1973. Supplemental Declaration of Sandra K. Russell ("Russell Supp. Decl."), ¶ 2. Throughout their marriage, Mrs. Russell had specific knowledge regarding their property holdings, including those titled in her husband's name alone. *Id.* After being diagnosed with cancer in 1985, Lewis Russell underwent "painful, often disabling treatment for that cancer frequently for the next 12 years, until he died in 1997." *Id*, ¶ 3. During her husband's treatment, Mrs. Russell took total responsibility for day-to-day management of the couple's finances and decisions regarding their property. *Id.*

The BIG BIN was built in 1985 and initially owned by Lewis S. Russell, Jr. Declaration of Sandra K. Russell ("Russell Decl."), ¶ 3. Pursuant to a Bill of Sale dated May 15, 1985, Mr. Russell acquired BIG BIN from Sundial Marine Tug & Barge Works, Inc. *Id*, Ex 1, p. 27. Mrs. Russell "watched the initial launch of the BIG BIN at Sundial Marine Tug & Barge Works, Inc. Immediately after she was launched, a Tidewater tug took the BIG BIN to Tidewater's facilities." *Id,* ¶ 4.

Mr. Russell and Tidewater entered into a three-year "Bareboat Charter Agreement" on May 1, 1985 ("1985 Charter"), by which Tidewater chartered the BIG BIN "on a bareboat basis," and obtained "the sole control over the same and its use." Russell Supp. Decl., Ex A, p. 1. By accepting delivery, Tidewater was "satisfied that the Vessel is fit and suitable for the purpose and uses to which Charterer intends to devote it and accepts the same as such, except for any latent defect in the vessel." *Id*, ¶ 3. Tidewater also agreed to bear the expenses of all repairs and "to keep Vessel in good operating and seaworthy condition." *Id,* ¶ 11. The 1985 Charter also contained an integration clause by which Mr. Russell disclaimed making any warranties or covenants other than those contained in the Charter. *Id*, ¶ 23.

5 - FINDINGS AND RECOMMENDATION

The 1985 Charter ended on April 30, 1988, but the next charter did not take effect until August 1, 1988, leaving an unexplained gap of three months. On June 28, 1988, Mr. Russell and Tidewater entered into a new three-year charter, effective August 1, 1988, and ending no later than August 1, 1991, by which BIG BIN was "bareboat chartered" to Tidewater ("1988 Charter"). *Id*, Ex B, p. 1, ¶ 2. As before, Mr. Russell relinquished, and Tidewater assumed, "responsibility, liability and benefit of and for the use, control and operation of the Vessel during the term of this agreement," and specifically for "all costs, expenses, taxes, assessments, fees, penalties, demurrage, damages, claims or other charges of any kind. . . " *Id.* By accepting delivery, Tidewater acknowledged the BIG BIN "to be fit for any and all purposes for which the same is chartered hereunder," and that "Owner hereby specifically disclaims any and all warranties, whether express or implied, concerning the seaworthiness of the Vessel. . . " *Id,* ¶ 7. The parties agreed that "all and any risk of loss or damage and liability arising out of the use, operation or condition of the Vessel" from delivery to redelivery and including any extensions "shall be born in total by Charterer to the same extent and with like effect as though Charterer was the lawful owner of the Vessel." *Id,* ¶ 10.2.

On August 18, 1992, Mr. Russell and Tidewater executed a lease of the BIG BIN and two other vessels as one fleet, effective August 1, 1991, for a period of 60 months ("1992 Lease"). *Id,* Ex. C, p. 1. Again Mr. Russell relinquished and Tidewater assumed "responsibility, liability and benefit of and for the use, control and operation of the property," including all costs and claims arising from use, maintenance or condition of the property. *Id,* ¶ 14. By accepting delivery of the vessels, Tidewater acknowledged them to be "fit for any and all purposes for

which the same is leased hereunder." *Id*, ¶ 7.  Furthermore, Mr. Russell disclaimed any warranties, express or implied, including the warranty of seaworthiness.  *Id.*

As early as the late 1980s and no later than June 1995, Tidewater began operating the BIG BIN in container service and gave guidance to its employees and others concerning proper loading for containers.  Declaration of John Dudrey, ¶¶ 2, 3 & Ex 1.  Neither Mr. nor Mrs. Russell was consulted nor involved in the decision to employ the BIG BIN in container service. Russell Suppl. Decl., ¶ 5.

On August 26, 1996, Mr. Russell and Tidewater signed an Extension of Lease, effective July 31, 1996, which extended the previous lease until a new lease could be agreed to and executed by the parties, or alternatively, until either party terminated the extension.  *Id,* Ex C, pp. 35-36.

Mrs. Russell became a co-owner of BIG BIN in 1996.  Russell Decl., ¶ 4.  On December 15, 1996, Mr. and Mrs. Russell executed a "Bareboat Charter Party" with Tidewater for the BIG BIN and two other barges as a fleet, for an initial period through July 31, 2001, with an option for an additional charter period of 36 months ("1996 Charter").  Russell Decl., Ex 1, p. 4.  Again the owners relinquished, and Tidewater assumed, "responsibility, liability and benefit of and for the use, control and operation of the Property during the term of this Charter," and specifically assumed "responsibility for all costs, expenses . . .  damages, claims or other charges of any kind . . . attributable to the use, operation, maintenance or condition of the Property. . ." *Id*, ¶ 4.  The owners disclaimed any representations and warranties, express or implied, including the warranty of seaworthiness.  *Id*, ¶ 7.

Mr. Russell passed away in 1997 (Russell Suppl. Decl., ¶ 3), leaving Mrs. Russell as the sole owner of the BIG BIN.  Mrs. Russell and Tidewater renewed the 1996 Charter in July 2001 for a three-year term beginning on August 1, 2001 and ending on July 31, 2004.  Russell Decl., Ex 1, p. 28.

///

///

## DISCUSSION

Sandra K. Russell argues that contends that her warranty of unseaworthiness ran only to Tidewater and that Tidewater waived that warranty.  She also contends that due to her bareboat charter with Tidewater, she is insulated from liability to third parties for any unseaworthy condition.  Moreover, she asserts that she cannot be held liable to the Port of Portland and MTC for indemnity or contribution because she is not a joint tortfeasor with them for any negligence alleged against them by Tidewater.

The Port of Portland and MTC dispute that Tidewater had a continuous bareboat charter.  But even if it did, they contend that, in a tort situation, an owner may be held liable to third parties for unseaworthiness that post-dates a bareboat charter.  In addition, they assert that a maritime claim for contribution does not depend on common liability to Tidewater and that all potentially liable parties for damage caused by the capsizing should be joined in this case.  Tidewater and Sandra K. Russell can then allocate liability between them according to their charter contract.

## I.     **Applicable Law**

As a threshold issue, the parties disagree as to whether Oregon or general maritime law applies to the contribution claim. Sandra K. Russell asserts that Oregon law applies to the extent not inconsistent with federal law. *See Wheeler v. Bonnin*, 47 Or App 645, 650, 615 P2d 358 (1980). However, since 1980, federal courts have recognized a substantive maritime right of contribution. *See McDermott, Inc. v. AmClyde*, 511 US 202, 207, 211, 217 (1994); *Miller v. Christopher*, 887 F2d 902, 903 (9th Cir 1989) (where, in a maritime contribution claim, the court refused to apply the state law of the forum, but instead looked at the principles of federal maritime law). Accordingly, federal maritime law, rather than Oregon law, applies to determine the contours of the claim for contribution.

## III.   <u>Merits of Contribution Claim</u>

### A.   <u>Allegations</u>

The Port of Portland and MTC allege that the BIG BIN was unseaworthy because it:

1.  Was not fit for use as a carrier of cargo containers;

2.  Did not have proper watertight integrity;

3.  Had perforations in the bin walls;

4.  Had water in the bottom of the cargo bin, in the double bottom, or both; and

5.  Was unstable.

Fourth-Party Complaint for Contribution, ¶ 10.

The Port of Portland and MTC further allege that the damages for which Tidewater claims indemnity or contribution were caused at least in part by the unseaworthiness of the BIG BIN. *Id*, ¶ 11. If either the Port of Portland or MTC should be found liable for any damages alleged by Tidewater, they seek contribution from Sandra K. Russell as the owner in an amount

proportionate to the contribution of the unseaworthiness of the BIG BIN to the damages Tidewater alleges. *Id*, ¶ 12.

Alternatively, the Port of Portland and MTC tender Sandra K. Russell to Tidewater pursuant to FRCP 14(c) "as a fourth-party defendant liable to Tidewater for contribution, without limitation of liability" based on the same allegations of unseaworthiness. *Id*, ¶ 13.

///

///

**B.    Alternative Claim Under FRCP 14(c)**

FRCP 14(c) is a procedural mechanism which provides in part as follows:

> When a plaintiff asserts an admiralty or maritime claim within the meaning of Rule 9(h), the defendant or person who asserts a right under Supplemental Rule C(6)(b)(I), as a third-party plaintiff, may bring in a third-party defendant who may be wholly or partly liable, either to the plaintiff or to the third-party plaintiff, by way of remedy over, contribution, or otherwise on account of the same transaction, occurrence, or series of transactions or occurrences.

Following this procedure, the Port of Portland and MTC (as third-party plaintiff, or in this case, as third-party defendants/fourth-party plaintiffs) may demand judgment against Sandra K. Russell (a third-party defendant, or in this case, a fourth-party defendant) in favor of Tidewater (the plaintiff) based on a contribution claim, in which case Sandra K. Russell may allege defenses to the claims of both Tidewater and the Port of Portland and MTC. The action then proceeds as if Tidewater had commenced it against both Sandra K. Russell, as well as against the Port of Portland and MTC.

However, in order to bring Sandra K. Russell into this case, she must first be "wholly or partly liable, either to the plaintiff [Tidewater] or to the third-party plaintiff [fourth-party

plaintiffs Port of Portland and MTC]." FRCP 14(c). In other words, the procedural mechanism of FRCP 14(c) does not apply unless Sandra K. Russell is potentially liable for contribution to Tidewater or to the Port of Portland and MTC. In other words, the issue under both the contribution claim and the alternative claim under FRCP 14(c) is the same, namely the potential liability of Sandra K. Russell for a claim of unseaworthiness.

///

///

## C.    <u>Concurrent Fault</u>

General maritime law recognizes a claim for contribution from a joint tortfeasor. *Cooper Stevedoring Co., Inc. v. Fritz Kopke, Inc.*, 417 US 106 (1974). However, contribution and indemnity are "not available unless the indemnitor could be held liable to the person injured." *California Home Brands, Inc. v. Ferreira,* 871 F2d 830, 834 (9th Cir 1989). "Contribution rests upon a finding of concurrent fault." *Cooper Stevedoring*, 417 US at 115.

Sandra K. Russell contends that she cannot be held concurrently liable for the negligence alleged by Tidewater against the Port of Portland and MTC. Instead, her liability, if any, rests solely on allegations of unseaworthiness, not negligence. Unlike negligence, unseaworthiness is a strict liability claim by which the owner or operator of a vessel is obligated to provide a vessel and its appurtenances that are fit for their intended purposes; a finding of fault is not required. *See Cooper Stevedoring Co.,* 417 US at 115.

Although Tidewater contends that the Port of Portland and MTC were negligent in the unloading of the cargo, no one alleges that Sandra K. Russell was negligent. As a result, she does not share any common liability with the Port of Portland and MTC based on negligence.

However, a maritime claim for contribution does not necessarily depend on the common liability of the party claiming contribution and the party resisting it. *See British Transport Comm'n v. United States*, 354 US 129 (1957) (bringing in all parties potentially liable for damage arising from a collision of ships). "The clear trend in maritime cases is to reject all-or-nothing or other arbitrary allotments of liability in favor of a system that divides damages on the basis of the relative degree of fault of the parties." *Id*, 154 F3d at 1047, citing *Smith & Kelly Co. v. S/S Concordia TADJ*, 718 F2d 1022, 1030 (11th Cir 1983).

Although liability of unseaworthiness is not based on fault, it still may serve as a source of concurrent fault for purposes of a contribution claim. As explained by the Ninth Circuit with respect to determining when a shipowner is at fault for causing injury to a seaman by its own independent acts, "[t]he term 'fault' includes both the shipowner's negligence as well as breach of the seaworthiness warranty." *Knight v. Alaska Trawl Fisheries, Inc.*, 154 F3d 1042, n5 (9th Cir 1998). Based on this broad definition of fault, the right of maritime contribution should extend to all those who allegedly contributed to or caused the injury or damage, regardless of whether the theory is based on negligence, strict liability, or breach of warranty.

Here, the capsizing of the BIG BIN was allegedly caused both by unseaworthiness, as well as negligence in loading, securing, and unloading the cargo. If the unseaworthiness of the BIG BIN caused, in whole or in part, its capsizing and subsequent damage, then all those who are potentially liable for its unseaworthiness may be liable for contribution to other potentially liable parties, regardless of the legal basis for their liability, and should be made a party to this limitation action.

D.     **Liability for Unseaworthiness**

Sandra K. Russell also contends that she is not potentially liable for unseaworthiness based on her bareboat charter with Tidewater. As discussed below, this court concludes that because the 1996 Charter was a bareboat charter, Sandra K. Russell cannot be held liable to Tidewater, and hence cannot be held liable to the Port of Portland and MTC for contribution, for any alleged unseaworthiness and, therefore, must be dismissed.

///

///

1.      **Effect of Bareboat Charter**

A charter is an agreement to lease a vessel. There are two types of charters: "time" or "voyage" charters[1] on one hand and "demise" charters on the other. *Walker v. Brau*, 995 F2d 77, 80 (5th Cir 1993). In "time" or "voyage" charters, the owner "maintains possession and control of the vessel," provides the crew, is responsible for operating expenses, equips and maintains the vessel, makes repairs and provides insurance. *Id,* 995 F2d at 81. By contrast, in "bareboat" or "demise"[2] contracts:

> full possession and control of the vessel are delivered up to the charterer for a period of time. The ship is then directed by its Master and manned by its crew; it makes his voyages and carries the cargo he chooses. Services performed on board the ship are primarily for his benefit. It has long been recognized in the law of admiralty that for many, if not most, purposes the bareboat charterer is to be treated as the owner, generally called owner pro hac vice.

---

[1] A "time" charter is an agreement to lease the vessel to the charterer for a fixed period of time, while a voyage charter is an agreement to lease the ship for a single voyage. *See* Charles M. Davis, MARITIME LAW DESKBOOK, p. 322 (2005).

[2] When a vessel with a preexisting master and crew is under a demise charter, they remain on the vessel and are subject to the orders of the charterer. *See* Robert Force, ADMIRALTY AND MARITIME LAW, Federal Judicial Center, 43 (2004). In another type of demise charter, called "bareboat," the owner turns the vessel over to the charterer without a master and crew. *Id.*

*Reed v. S.S. Yaka,* 373 US 410, 412 (1963), *reh'g denied,* 375 US 872 (1963), *superseded by statute on other grounds, Kelly v. Pittsburgh & Conneaut Dock Co.*, 900 F2d 89, 93 (6th Cir 1990).

A charter qualifies as a demise charter if the owner of the vessel has "completely and exclusively" relinquished "possession, command, and navigation thereof to the demise;" anything short of that constitutes a voyage or time charter, or not a charter at all. *Guzman v. Pichirilo*, 369 US 698, 699, 700 (1962). A demise charter is "tantamount to, though just short of, an outright transfer of ownership." *Id,* 369 US at 700; *also see Baker v. Hasbrouck*, 1991 WL 240740, *3 (D Or 1991) (the effect of a bareboat charter is to "vest *pro hac vice* ownership" in the charterer).

The distinction between time and voyage charters on one hand, and bareboat and demise charters on the other, is important in determining an owner's liability to the charterer and to third parties. In "time" or "voyage" charters, at the beginning of every voyage, the owner must provide the time or voyage charterer a warranty of seaworthiness "without limitation." *Luckenbach v. W. J. McCahan Sugar Refining Co.*, 248 US 139, 150 (1918). "Seaworthiness" requires that the vessel be fit for the purpose intended under the charter party, including being "reasonably fit to carry the cargo which she has undertaken to transport." *The Silvia*, 171 US 462, 464 (1898). A vessel owner can limit or disclaim the warranty by a clause in the charter. *A. Kemp Fisheries, Inc. v. Castle & Cooke*, *Inc.*, 852 F2d 493 (9th Cir 1988).

In contrast in bareboat and demise charters, the charterer "is personally liable for the unseaworthiness of a chartered vessel . . ." *Reed*, 373 US at 410. Therefore, the owner is not liable to the bareboat or demise charterer for any claims of unseaworthiness.

Although the Supreme Court has noted but not decided the issue (*id* at 412, n1), the Ninth Circuit has held that under a bareboat or demise charter, an owner also has no liability for unseaworthiness to a third party. *Dant & Russell, Inc. v. Dillingham Tug & Barge Corp.*, 895 F2d 507, 510 (9th Cir 1989). In *Dant & Russell*, the owner of a barge entered into a demise charter with a party who then entered into a voyage charter with plaintiff. The owner's agent deferred making recommended repairs to the bilge and ballast system until after the voyage. During the voyage, part of the cargo was damaged because ballast water leaked through the ballast lines. The owner stipulated that its barge was unseaworthy, but contended that it was not liable to plaintiff for breach of warranty of unseaworthiness because it was unaware of that condition at the time of the charter. The court absolved the owner of liability for two reasons. First, prior to the charter, the demise charterer "had full knowledge of the vessel's unseaworthiness and assumed all risks." *Id*, 895 F2d at 510. Noting that owners are absolved of liability which a demise charterer could have ascertained by reasonable inspection, the court held that the demise charterer waived any warranty claims against the owner. Second, the owner and the third party were not in privity. "An owner who has demised his ship is not indeed liable to anyone but the demisee under his warranty of seaworthiness for any loss or injury suffered during the demise. Such liabilities sound in contract and he has not made any contract with anyone else." *Id* at 510, quoting *Cannella v. Lykes Bros, S.S.* Co., 174 F2d 794, 796 (2nd Cir), *cert denied,* 338 US 859 (1949). As described by *Green Atlas Shipping S.A. v. United States*,

306 F Supp2d 974, 980 (D Or 2003), *Dant & Russell* holds that a "demise charter is [an] effective means of transferring liability from the owner."

*Dant & Russell* involved parties with contractual relationships, and the alleged unseaworthiness predated the demise charter. The Port of Portland and MTC argue that this case, in contrast, involves tort claims and allegations of unseaworthiness both predating and postdating a demise charter. Based on those distinctions, the Port of Portland and MTC urge this court to instead follow a different path taken by the Fifth Circuit in *Baker v. Raymond Int'l, Inc.,* 656 F2d 173, 184 (5th Cir 1981), *cert denied*, 456 US 983 (1982). In that case, the owner of a barge entered into a bareboat charter with the seaman's employer who had complete possession and control of the barge. The seaman sued the owner for injuries sustained while working on the barge. *Baker* held that "a seaman may have recourse in personam against the owner of an unseaworthy vessel, without regard to whether owner or bareboat charterer is responsible for the vessel's condition." *Id*, 646 F2d at 184.

This court is not persuaded by *Baker* for several reasons. First, the Fifth Circuit justified the result in *Baker* on a narrowly-tailored public policy reason to protect "an injured seaman, of presumably limited resources" from having to speculate on the existence and legal effect of a bareboat charter. *Id.* That public policy does not apply to claims for cargo loss and other property damage where the injured parties usually have contractual relationships which allocate the risk of loss.

Second, *Baker* was decided prior to, but not mentioned by, *Dant & Russell*, and has been expressly rejected by other district courts in the Ninth Circuit. In *Griffith v. Martech Int'l, Inc.,*

754 F Supp 166, 171 (CD Cal 1989), a diver sued the owner of the vessel for unseaworthiness. Noting the divergent view of *Baker*, the court followed *Dant & Russell* and held that the owner could not be held liable for unseaworthiness due to its bareboat charter.  In *Goodwin v. Guy F. Atkinson Const. Co.*, 1991 WL 187462, *2 (D Or 1991), Judge Panner dismissed a wrongful death action against a barge owner based on a claim of unseaworthiness, stating: "Although *Baker's* reasoning is interesting, I conclude that the Ninth Circuit would not follow the Fifth Circuit's lead."

Third, contrary to the approach advanced by the Port of Portland and MTC, the insulation enjoyed by an owner under a bareboat charter should not depend on whether the claim of unseaworthiness arises out of a contractual or tortious relationship with the injured party. Unseaworthiness is the duty of the owner, but the owner can transfer that duty to a charterer through a bareboat charter.  Once transferred, the owner no longer has control over the vessel, and the charterer becomes the equivalent of the owner.  The duty of providing a seaworthy vessel continues to exist, but is owed by the party that actually possesses and controls the vessel.

Fourth, although *Dant & Russell* addresses only an unseaworthiness claim arising prior to a bareboat charter, its rationale has been extended by other courts to claims of unseaworthiness arising after the vessel is delivered to a bareboat charterer.  *Goodwin,* supra; *also see Cintorino v. Ocean Ships, Inc.*, 2000 WL 33179300, *4 (D Ha 2000) (expanding *Dant & Russell* to apply to post-demise conditions of unseaworthiness).  Other circuits have reached the same conclusion. In *Kerr-McGee Corp. v. Lau*, 479 F2d 61, 63 (4th Cir 1973), cited with approval by *Dant & Russell*, the Fourth Circuit held that if the barge was seaworthy at the time the owner bareboat-chartered it, the owner owed no duty to the third party regarding the condition of the barge post-

demise.  Since the owner "no longer has the right to control the use of the vessel, he is no longer charged with the duties and liabilities that arise out of its ownership" and has no duty to maintain the vessel once it has been demise chartered.  *Id*, 479 F2d at 63, 64.  Rather, the charterer becomes "subject to the duties and responsibilities of ownership."  *Id,* citing *Leary v. United States*, 81 US 607, 610 (1871).  While holding that an owner is liable to third parties for conditions of unseaworthiness existing at the time of the demise, the Second Circuit similarly has concluded that an owner is "not indeed liable to any one but the demisee under his warranty of seaworthiness for any loss or injury suffered during the demise."  *Cannella,* 174 F2d at 796, cited with approval by *Dant & Russell.*  Similarly, the Third Circuit has held that an owner is not liable for unseaworthiness to injured third parties while a demise charterer is operating the vessel.  *Reed*, 307 F2d at 205-206, *reversed on other grounds,* 373 US 410 (1963).

Based on *Dant & Russell* and other cases, this court concludes that a bareboat charter insulates an owner from liability to the charterer and to third parties both for conditions of unseaworthiness known to the charterer prior to the charter and for conditions of unseaworthiness arising during the charter.  Simply put, an owner should not be punished for conditions of unseaworthiness knowingly accepted by the charterer or arising when the owner is not in control and possession of the vessel.

This court recognizes that if Tidewater is successful in limiting its liability to the fund deposited with the court, then the Port of Portland and MTC may not be able to fully recover for any losses which exceed the amount of the fund without the presence of Sandra K. Russell in this case.  However, by the same token, if Tidewater is able to limit its liability, so will Sandra K. Russell.  Only if Sandra K. Russell knew of some latent condition of unseaworthiness that was

unknown to Tidewater, would their potential liability diverge. In that event, however, the bareboat charter would not insulate Sandra K. Russell from liability for unseaworthiness.

Whether Sandra K. Russell has any potential liability for damages that arose before or during the time that BIG BIN was bareboat-chartered depends on whether she entered into a bareboat charter with Tidewater. If so, then only Tidewater, and not Sandra K. Russell, is the liable party for any claims of unseaworthiness involving conditions arising during the charter, as well as conditions arising before the charter of which Tidewater had full knowledge.

On the other hand, if the charter to Tidewater is not a bareboat charter, then Sandra K. Russell may be held liable to Tidewater (and hence for contribution to the Port of Portland and MTC) for damages for any unseaworthiness of the BIG BIN arising before or during the charter. Therefore, this court next turns to the issue whether the BIG BIN was being operated pursuant to a bareboat charter when it capsized in 2003.

2.      **Existence of Bareboat Charter**

a.      **Legal Standard**

No formal language is necessary to create a demise charter; it is enough that the charter language shows "an intent to transfer the possession, command, and control." *United States v. Shea*, 152 US 178, 189 (1894). Moreover, courts look at both the agreement and the conduct of the parties in determining whether a bareboat charter has been formed. *Id*, 152 US at 190.

The issue of whether there is a bareboat charter is a question of law. *Baker v. Hasbrouck*, 1991 WL 240740, *2 (D Or 1991), citing *In re Complaint of Admiral Towing & Barge Co.*, 767 F2d 243, 249 (5th Cir 1985). The owner has the burden of establishing that he has been

temporarily relieved of his normal liability for seaworthiness. *Guzman,* 369 US at 700. Courts are "reluctant to find a demise when the dealings between the parties are consistent with any lesser relationship," and the burden of establishing the existence of a demise charter is "heavy." *Id*. Prior to *Guzman*, the United States Supreme Court found no demise charter where the owners had selected the captain and employed the crew. *Leary, supra.* However, *Guzman*, held that the owner's employment of the captain was "not fatal to the creation of a demise charter party" if the captain was subject to the orders of the charterer during the demise. *Guzman*, 369 US at 701, citing *Shea*, 152 US at 190. Moreover, industry custom may be helpful. "Because barges lack power and usually have no crew, contracts for the mere use of a barge are usually bareboat." *Agrico Chemical Co. v. M/V M. W. Martin,* 664 F2d 85, 91 (5th Cir, 1981), *citing* A. Parks, LAW OF TUG, TOW AND PILOTAGE 4, 394 (1971).

### b.    Analysis

At the time of its capsizing in 2003, the BIG BIN was being operated by Tidewater pursuant to the 1996 Charter and its 2001 extension. Although the 1996 Charter is captioned "Bareboat Charter Party" and contains an express waiver of the warranty of unseaworthiness, the Port of Portland and MTC question whether it and its predecessors are true bareboat charters. In particular, they point to paragraph 6 of the 1996 Charter by which the Russells restricted a change in use of the vessel, prohibited the carrying of petroleum products and other cargo, and limited operation to the Columbia River and its tributaries. In contrast, a classic bareboat charter, according to the Port of Portland and MTC, simply states that the charterer is responsible for everything, except for returning the vessel in good condition less normal wear and tear.

However, paragraph 4 of the 1996 Charter expressly states that Sandra K. Russell relinquished, and Tidewater assumed, "responsibility, liability and benefit of and for the use, control and operation of the Property during the term of this Charter," and Tidewater specifically assumed "responsibility for all costs, expenses . . . damages, claims or other charges of any kind . . . attributable to the use, operation, maintenance or condition of the Property. . ." Tidewater also waived the warranty of unseaworthiness in paragraph 7, and in paragraph 27 it acknowledged that it had made an inspection and survey in March 1996 and accepted the vessel without reservation, including its fitness for its intended use. These provisions are fully consistent with a bareboat charter.

Even if this court interprets paragraph 6 as reserving some modicum of control to the Russells, Sandra K. Russell confirms that Tidewater has possessed and been solely responsible for the operation, maintenance and control of the BIG BIN since it was built. Russell Decl., ¶ 5. The Port of Portland and MTC question the veracity of Mrs. Russell's statement, but have produced no evidence sufficient to create a genuine issue of fact in that regard.

With her Reply, Sandra K. Russell submitted her Supplemental Declaration which attaches the pre-1996 charters. Reviewing those pre-1996 charters, the Port of Portland and MTC note the following provisions concerning control retained by the owner that are allegedly inconsistent with a bareboat charter:

      1. In paragraph 7 of the 1985 Charter, the owner retained the right to inspect the BIG BIN;

2.  Paragraph 9 of the 1985 Charter confines operation of the vessel to the

Columbia River and its tributaries;

3.  Paragraph 12 of the 1985 Charter which prohibits Tidewater from

making any alterations, changes or additions to the vessel without the

owner's prior written consent;

4.  Paragraph 5.1 of the 1988 Charter contains a geographical limitation;

5.  Paragraph 5.2 of the 1988 Charter bars Tidewater from carrying certain

types of cargo; and

6.  The 1992 Lease is not captioned a bareboat charter and contains

provisions in paragraph 6 which are similar to paragraphs 5.1 and 5.2 of

the 1988 Charter.

Because they first received the pre-1996 charters with the Reply filed by Sandra K.

Russell, the Port of Portland and MTC complain that they have not had an opportunity to

conduct discovery as to the actual extent of the owner's control of the BIG BIN by inquiring of

Mrs. Russell and reviewing her files.  For example, an operating agreement, if it exists, could

change the owner's responsibilities.  Accordingly, pursuant to FRCP 56(f), they seek an

opportunity to request discovery on this issue prior to resolution of this motion.

Sandra K. Russell objects on the basis that the Port of Portland and MTC have had a full

opportunity to request such discovery earlier.  With respect to discovery concerning the pre-1996

charters, that objection is not well-taken.  The Port of Portland and MTC had no reason to

request discovery on the pre-1996 charters until receiving those additional documents with the Reply filed by Sandra K. Russell.

However, facts concerning the pre-1996 charters and dealings between the Russells and Tidewater are not necessary to decide this motion. The charter in effect at the time of the 2003 capsizing was the 1996 Charter and its 2001 extension. As discussed above, Sandra K. Russell has submitted evidence in the form of documents and testimony that the 1996 Charter was a bareboat charter based on the requisite intent of the Russells to transfer possession, command, and control of the BIG BIN to Tidewater. To avoid summary judgment, the Port of Portland and MTC must submit contrary evidence to create a genuine issue of fact. They have not done so.

The failure to meet that burden cannot be excused by a lack of opportunity to conduct discovery. Prior to seeking leave to file the Fourth-Party Complaint on December 14, 2004, the Port of Portland and MTC received a copy of the 1996 Charter. Discovery did not close until May 31, 2005. Had the Port of Portland and MTC believed that the 1996 Charter was not a bareboat charter, they had sufficient time to conduct discovery as to any retained right of control by the Russells prior to the close of discovery. Therefore, Sandra K. Russell is entitled to summary judgment that the 1996 Charter is a bareboat charter which insulates her from liability for unseaworthiness claims.

The only relevancy of pre-1996 Charters and course of dealing would be to determine whether the Russells knew anything about the BIG BIN that Tidewater would not have known at the time of the 1996 Charter. Three of the five allegations of unseaworthiness against Sandra K. Russell would have arisen prior to the 1996 Charter, namely not being fit for use as a carrier of cargo containers, not having proper watertight integrity, and having perforations in the bin walls.

Watertight integrity and perforations in the bin walls, if they existed in 1996, would not have been latent, but would have been obvious or known to Tidewater, especially since it inspected the barge in March 1996. With respect to fitness for use as a carrier of cargo containers, Tidewater began operating the BIG BIN in container service as early as the late 1980s and no later than June 1995, well before the 1996 Charter, and continued doing so until 2003. As a result, Tidewater should have been fully aware whether the barge was fit for carrying cargo containers prior to 1996. Therefore, Sandra K. Russell could have no liability for the three alleged unseaworthy conditions pre-existing the bareboat charter. Accordingly, there is no basis for allowing additional discovery by the Port of Portland and MTC concerning the time period before the 1996 Charter in order to decide this motion.

Due to the lack of any genuine issue of material fact concerning whether the 1996 Charter and its 2001 extension constituted a bareboat charter, this court recommends that Sandra K. Russell's motion for summary judgment be granted.

## RECOMMENDATION

Based on the foregoing, the oral motion of the Port of Portland and MTC under FRCP 56(f) to conduct additional discovery should be DENIED, and Sandra K. Russell's Motion for Summary Judgment (docket #136) should be GRANTED. As a result, judgment should be entered dismissing the Fourth-Party Complaint for Contribution against Sandra K. Russell.

## SCHEDULING ORDER

Objections to the Findings and Recommendation, if any, are due November 14, 2005. If no objections are filed, then the Findings and Recommendation will be referred to a district court judge and go under advisement on that date.

If objections are filed, then a response is due within 10 days after being served with a copy of the objections. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will be referred to a district court judge and go under advisement.

DATED this 21st day of October, 2005.

s/  Janice M. Stewart_____
Janice M. Stewart
United States Magistrate Judge