IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

TIDEWATER BARGE LINES, INC.,
as demise owner of the barge BIG BIN,

                Plaintiff,

In a cause for exoneration from or            Case No. 03-CV-1225-ST
limitation of liability.

---

CP SHIPS, LTD., ITALIA di                           FINDINGS AND
NAVIGAZIONE, S.p.A, CONTSHIP                 RECOMMENDATION
CONTAINER LINES, LTD.,                            (CP Ships Motion)
AUSTRALIA-NEW ZEALAND DIRECT
LINES, and TMM LINES, LTD.,

                Claimants/Third-Party
                Plaintiffs,

   v.

THE PORT OF LEWISTON, an Idaho
municipal corporation,

                Third-Party Defendant,

1 - FINDINGS AND RECOMMENDATION

and

THE PORT OF PORTLAND, an Oregon municipal corporation, and MARINE TERMINALS CORPORATION, a Nevada corporation,

        Claimants/Third-Party Defendants.

STEWART, Magistrate Judge:

## INTRODUCTION

On March 28, 2003, a barge named BIG BIN capsized at its berth at the Port of Portland during container discharge operations, causing the loss of cargo. Plaintiff, Tidewater Barge Lines ("Tidewater"), was the bareboat charterer and operator of the BIG BIN. Pursuant to 46 USC app §§ 183-195 and Supplemental Rule F of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure, Tidewater seeks exoneration from or limitation of liability for the losses caused by the capsizing of BIG BIN.

Opposing Tidewater are numerous claimants seeking recompense for the losses they suffered to their interests in the BIG BIN's cargo. Claimants and Third Party Plaintiffs, CP Ships, Ltd., Italia di Navigazione, S.p.A., Contship Container Lines, Ltd., Australia-New Zealand Direct Lines and TMM Lines, Ltd. (collectively "CP Ships"), filed a claim against Tidewater to recover damages to their containers based on breach of contract, negligence, breach of the implied warranty of workmanlike performance and indemnity. CP Ships contends that the containers were improperly loaded, stowed and secured on the BIG BIN. Moreover, the BIG BIN allegedly was not fit for its intended voyage and, therefore, was unseaworthy because it was not fitted with equipment that could be used to secure the containers.

In its Fifth Affirmative Defense and First Claim for Relief against CP Ships, Tidewater tries to shift responsibility for making the barge unseaworthy and for loading, stowing, and securing the containers by pointing to provisions in its Freight Tariff 200-A. Tidewater's Fifth Affirmative Defense alleges that: "Each and every claim filed is subject to and limited by the contractual limitations set forth in Tidewater's Freight Tariff 200-A and the maritime contracts between Tidewater and Claimants or between Claimants themselves." *Tidewater Objection to Claims, Affirmative Defenses, Cross-Claims and Counterclaims,* ¶ 9. Similarly, the First Claim for Relief alleges that Freight Tariff 200-A governed the terms and conditions for transporting, loading and unloading the containers and cargo at issue and that Tidewater performed according to the Tariff. *Id,* ¶¶ 12-13. Tidewater further alleges that CP Ships breached its contract with Tidewater by failing to pay costs and damages relating to the loading, unloading, blocking and bracing of the containers and cargo, which by the terms of the Tariff was the responsibility of CP Ships. *Id,* ¶ 14.

CP Ships has now filed a Motion for Judgment on the Pleadings and alternative Motion for Summary Judgment against Tidewater (docket #147). Specifically, CP Ships seeks to: (1) strike Tidewater's Fifth Affirmative Defense from limitation pursuant to FRCP 12(h) or, in the alternative, grant partial summary on the basis that exculpatory provisions in Tidewater's Freight Tariff 200-A are found null and void; (2) dismiss Tidewater's First Claim for Relief against CP Ships pursuant to FRCP 12(h) or, in the alternative, grant summary judgment. Claimants/Third Party Defendants the Port of Portland and Marine Terminals Corporation join in CP Ships' motion (docket # 185).

This court concludes that Tidewater's Freight Tariff 200-A is valid and, therefore, based on a genuine issue of material fact as to causation, CP Ships motion should be denied.

## LEGAL STANDARD

Parties can move for judgment on the pleadings after the pleadings are closed, but within a reasonable time as to not delay trial. FRCP 12(c). "[A] judgment on the pleadings is appropriate when, even if all the allegations in the complaint are true, the moving party is entitled to judgment as a matter of law." *Westland Water Dist. v. Firebaugh Canal*, 10 F3d 667, 670 (9th Cir 1993), citing *Hal Roach Studios v. Richard Feiner & Co.*, 896 F2d 1542, 1550 (9th Cir 1990). However, "if, on a motion for judgment on the pleadings, matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment." FRCP 12(c); *see also Hal Roach Studios*, 896 F2d at 1550.

Here both parties have submitted matters outside the pleadings without objection. Therefore, this court will treat Tidewater's motion to strike and for judgment on the pleadings as one for summary judgment. FRCP 56(c) authorizes summary judgment if "no genuine issue" exists regarding any material fact and "the moving party is entitled to judgment as a matter of law." The moving party must show an absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 US 317, 323 (1986). The court must "not weigh the evidence or determine the truth of the matter, but only determines whether there is a genuine issue for trial." *Balint v. Carson City*, 180 F3d 1047, 1054 (9th Cir 1999) (citation omitted). A "'*scintilla* of evidence,' or evidence that is 'merely colorable' or 'not significantly probative,'" does not present a genuine issue of material fact. *United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F2d 1539, 1542 (9th Cir), *cert denied*, 493 US 809 (1989) (emphasis in original) (citation omitted). The

substantive law governing a claim or defense determines whether a fact is material. *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F2d 626, 630 (9th Cir 1987). The court must view the inferences drawn from the facts "in the light most favorable to the nonmoving party." *Id* (citation omitted). Thus, reasonable doubts about the existence of a factual issue should be resolved against the moving party. *Id* at 631.

## MATERIAL FACTS

Tidewater and CP Ships are both engaged in the business of shipping. Tidewater was the bareboat charterer and operator of the barge known as the BIG BIN.

CP Ships was hired by 12 shippers to carry cargo goods in containers owned and supplied by CP Ships from Lewiston, Idaho, to ports overseas. CP Ships in turn entered into a contract with Tidewater to carry by barge 102 containers from Lewiston, Idaho, to Portland, Oregon. In Portland, the containers were to be loaded aboard a CP Ships vessel for the ocean portion of the carriage.

CP Ships hired the Port of Lewiston to load the containers onto the BIG BIN on March 25, 2003. Tidewater provided stacking cones to the Port of Lewiston for use in securing containers aboard barges. *Declaration of Todd Zilbert ("Zilbert Decl."), Ex 2*. Tidewater also provided barge loading and capacity information to the Port of Lewiston. *Id, Ex 3*. Except for stacking cones, no other manner of securing containers was employed on the BIG BIN; specifically, no lashing wires, lashing bars or other means of securing containers to the barge or to the cargo bin were employed. *Id, Ex 4*.

Between March 25 and March 28, 2003, pursuant to contracts for cargo service with CP Ships, Tidewater towed the BIG BIN containing 102 shipping containers from Lewiston to

5 - FINDINGS AND RECOMMENDATION

Portland. CP Ships hired the Port of Portland to unload the containers upon their arrival in Portland. On March 28, 2003, during the unloading process, the BIG BIN capsized at its berth at the Port of Portland, Terminal 6, spilling 100 containers into the Columbia River. Although the cause of the capsizing is disputed, the toppling of containers within the barge's cargo bin contributed to the capsizing.[1]

## DISCUSSION

CP Ships moves for judgment on the pleadings to strike Tidewater's Fifth Affirmative Defense or, in the alternative, for partial summary on the basis that exculpatory provisions in Tidewater's Freight Tariff 200-A are null and void. CP Ships also moves for judgment on the pleadings to dismiss Tidewater's First Claim for Relief against CP Ships or, in the alternative, for summary judgment.

Both motions depend on exculpatory provisions of the Freight Tariff 200-A. That Tariff provides that Tidewater is not responsible or liable for any loss or damage to cargo during loading or unloading. In particular, item 340 in the Tariff, titled "Bill of Lading," states as follows:

> When property is transported subject to the provisions of this tariff, the acceptance and use is required of the bill of lading (a sample of which is provided in the protected insert immediately following this page), provided, however, that where the applicable rates do not include the loading or unloading of cargo, the carrier shall not be liable for any loss or damage to the cargo during the loading and/or loading [sic: unloading] thereof, the provisions of the carrier's bill of lading to the contrary not withstanding [sic].

---

[1] CP Ships contends that the shifting of containers *caused* or contributed to the capsizing. *Zilbert Decl., Ex 1.* Tidewater admits that the toppling of containers contributed to the capsizing, but contends the capsizing was proximately caused by the negligent conduct of the Port of Portland and/or Marine Terminals Corporation.

6 - FINDINGS AND RECOMMENDATION

*Zilbert Decl, Ex. 6, p. 8.*

In addition, the Tariff includes item 590, titled "Loading and Unloading," which states in part as follows:

> Rates in this tariff do not include stuffing nor unstuffing of containers nor the loading, unloading, blocking, unblocking, bracing or unbracing of shipments.
> Consignor and/or consignee shall stuff and unstuff containers and load, unload, block, unblock, brace and unbrace all shipments and shall assume liability for the improper performance thereof. Carrier will not be liable for any loss or damage to cargo during the performance of said services, the carrier's bill of lading to the contrary notwithstanding.

*Id* at 9.

For purposes of these motions, the parties agree that the Carriage of Goods by Sea Act, 46 USC app §§ 1300 *et seq* (2000) ("COGSA"), is the governing law. "COGSA applies to all cargo shipments which are carried by sea, to or from the United States." *Mori Seki USA, Inc. v. M/V Alligator Triumph*, 990 F2d 444, 447 (9th Cir 1993), citing 46 USC app §§ 1300-1315 (2000). COGSA applies from the time goods are loaded on board the vessel to the time they are discharged. 46 USC app § 1301(e) (2000).

Among the responsibilities and liabilities assigned to a carrier under COGSA is the duty to exercise due diligence before and at the beginning of a voyage to make the ship seaworthy, as well as the duty to "properly and carefully *load*, handle, stow, carry, keep, care for, and *discharge* the goods carried." 46 USC app §§ 1303(1) &(2) (2000). After a carrier receives goods, upon demand by the shipper, the carrier must issue a bill of lading. 46 USC app §1303(7) (2000).

7 - FINDINGS AND RECOMMENDATION

A carrier is not responsible for cargo loss or damage resulting from "an act or omission of the shipper or owner of goods, his agent or representative." 46 USC app § 1304(2)(i) (2000). However, in order to provide minimum protections to shippers that cannot be reduced by the carrier's bill of lading or tariff, COGSA prohibits the carrier from releasing itself from liability for its own negligence or for negligence by its agents or servants:

> Any clause, covenant, or agreement in a contract of carriage relieving the carrier or the ship from *liability for loss or damage to or in connection with the goods*, arising from negligence, fault, or failure in the duties and obligations provided in this section, or lessening such liability otherwise as provided in this Act, shall be null and void an of no effect.

46 USC app § 1303(8) (2000) (emphasis added).

CP Ships contends that COGSA § 1303(8) prohibits Tidewater (as the carrier) from limiting liability in its bill of lading for loss or damage arising out of the duties of loading and discharging goods. Tidewater responds that the damage limitation in its Freight Tariff 200-A is enforceable because Tidewater did not actually provide any services for loading or unloading the cargo. Rather, Tidewater contends that the loading or unloading of the BIG BIN was the sole responsibility of the stevedores hired by CP Ships and seeks to hold CP Ships accountable for its failure to fulfill the duties imposed on it by the Tariff.

### A. Validity of Freight Tariff 200-A

Tidewater is not relying on its Freight Tariff 200-A to exculpate itself from liability for negligence or unseaworthiness based on any actual involvement in cargo operations. Instead, it seeks to avoid imposition of any liability for the conduct or fault of CP Ships and its agents and servants. The issue is whether COGSA permits a carrier to shift responsibility to the shipper for loading and unloading operations.

8 - FINDINGS AND RECOMMENDATION

In *Atlas Ins. Co., Ltd. v. Harper, Robinson Shipping Co. Et al.*, 508 F2d 1381 (9th Cir 1975), the Ninth Circuit dealt with the extent to which a carrier can escape liability when another party takes responsibility for loading and unloading cargo. In that case, a shipper and a carrier entered into an agreement on a FIO (free in and out) basis, by which the shipper's stevedores would load and discharge the cargo and the shipper would assume the costs and responsibility for loading and discharging. Following the unloading, surveyors representing cargo interests noted damage to the cargo and attributed it to improper handling by the shipper's stevedores in loading and/or unloading. They made claims against the shipper's insurer which paid the claims. The shipper's insurer in turn sued the carrier as the subrogee of the cargo interests. "The equitable doctrine of subrogation passes to the insurer only those rights which the assured has and, if the rights of the assured have been limited by lawful contract, the rights of the insurer are likewise limited." *Id* at 1389 (citations omitted).

To decide whether the subrogation action was permitted, the court first had to determine what rights the shipper had against the carrier. The FIO clause between the shipper and the carrier, if valid, dictated both parties' rights and liabilities. The court found that the FIO clause was valid under COGSA because it "did not relieve [the carrier] of responsibility for its own acts" and "did no more than place the cost and responsibility for loading and discharging on [the shipper]." *Id.* Despite eliminating the "COGSA bill of lading presumptions against [the carrier], this is only to say that [the carrier] is not liable for what it has not done, viz., the stevedoring." *Id.* Because the stevedores hired by the shipper (and not the carrier) were liable for the damage from loading and unloading, the court declined to permit the shipper's insurer to sue the carrier and then require the carrier to sue the shipper under the FIO clause. That suit would effectively

be a circuitous suit against the shipper from whom the shipper's insurer could not recover based on the terms of the insurance contract.

Other courts also have allowed the carrier to contract away liability for loading and unloading to another party. In a similar case, *Sigri Carbon Corp. v. Lykes Bros. S.S. Co.*, 655 F Supp 1435 (WD Ky 1987), damage to cargo was caused by improper stowage. The bill of lading included a FIOS (free in/out stow) clause,[2] and the shipper had hired the stevedore to load the cargo. The court held that the carrier was "not responsible for the consequences of stowage performed by persons engaged by a shipper pursuant to a FIOS term in a bill of lading over whom the carrier exercises no control." *Id* at 1440. That conclusion was based on a finding that carriers *can* delegate their loading and unloading duties because §§ 1301-1304 of COGSA, read together, allow carriers "by a valid contract with the owner of the goods, [to] limit the services they agree to provide." *Id*, adopting the language in *Sumitomo Corp. of Am. v. M/V SIE KIM*, 632 F Supp 824, 836-839 (SDNY 1985), *declined to follow, Associated Metals & Minerals Corp. v. M/V Arktis Sky*, 978 F2d 47 (2nd Cir 1992) ("*Arktis Sky*"). Therefore, "the inclusion of an FIOS term in the bill of lading should not be disregarded as inconsistent with COGSA as long as it is understood that the term in no way relieves the carrier of responsibility for its own acts or for the acts of others under its control." *Id* at 1438, citing *Atlas*, 508 F3d at 1389, analyzed in *Sumimoto*, 632 F Supp at 837. To decide who would be liable for the stevedore's negligence, *Sigri Carbon* looked at both who hired the stevedore to load/unload and who controlled the stevedore's performance.

---

[2] FIOS means "that the vessel does not pay for the costs of loading, stowage and discharge." *Sigri Carbon,* 655 F Supp at 1438 (citations omitted).

The Eleventh Circuit in *Hale Container Line, Inc. v. Houston Sea Packing Co., Inc.*, 137 F3d 1455 (11th Cir 1998), also recognized the validity of clauses contracting away the carrier's duty and responsibility for loading, holding that "a shipper may contract with another party to exercise control over the loading and unloading of the cargo, and liability will be found by determining who controlled the loading and storage." *Id* at 1469 (citations omitted).

However, CP Ships relies on a contrary position taken by the Second Circuit in *Arktis Sky* which declined to follow the reasoning of *Sigri Carbon Corp.* and *Sumitomo Corp.* In *Arktis Sky* the shipper contracted with its own stevedore to load and stow the cargo. During the voyage, some of the cargo shifted, causing major damage. The cargo owner brought an action *in rem* against the vessel, its operator and its owner. Reversing a summary judgment granted to the defendants, the Second Circuit held that "the plain language of [COGSA §] 1308(8) forbids enforcement of agreements to relieve carriers of liability for negligence in carrying out the duties set forth in section 3 of the COGSA." *Id* at 50. However, *Arktis Sky* left the door open for a carrier to escape liability under a defense listed in COGSA § 1304(2)(i) "by carrying its burden of proof that the damage did not occur because of its own facts."[3] *Id* at 52. Therefore, instead of allowing the carrier to rely on its contract with the shipper to shift responsibility for the stevedore's conduct, the carrier has to prove that it did not cause the damage.

In *dicta*, the Fifth Circuit in *Tubacex, Inc. v. M/V Risan*, 45 F3d 951 (5th Cir 1995) agreed with the approach taken by *Arktis Sky*. Trying to avoid a delay by the carrier, the shipper in *Tubacex* decided to make other arrangements for its cargo and hired a stevedore to unload the

---

[3] COGSA § 1304(2)(i) provides the "Neither the carrier nor the ship shall be responsible for loss or damage arising or resulting from:. . . (i) Act or omission of the shipper or owner of the goods, his agent or representative."

11 - FINDINGS AND RECOMMENDATION

cargo from the carrier's barge. The cargo was then stored in open air, while wet, for several days, and the subsequent carrier noted damage to the cargo in its bill of lading. The shipper sued the first carrier to recover for damage to the cargo. The carrier relied on two defenses available under COGSA §§ 1304(2)(i) and (q),[4] arguing that the damage had happened "without the actual fault and privity of the carrier." *Id* at 955. The Fifth Circuit stated that "[COGSA] section 1303(8) would bar a provision in the bill of lading shifting liability for the duties set out in section 1303(2)," but embraced the view that carriers could still invoke the defenses in COGSA § 1304 to escape liability when the damage did not occur through an act of the carrier or its agents. *Id* at 956.

More recently, the Fifth Circuit tackled the issue of whether, under a FIOS clause[5] in a bill of lading, the vessel avoids liability for cargo damage that is caused during discharge by a stevedore controlled by the shipper. *Thyssen, Inc. v. Nobility et al.*, 421 F3d 295 (5th Cir 2005). "[T]he main inquiry to determine liability is which party controlled the negligent stevedore that caused the damage." *Id* at 307. While *Thyssen* did not automatically conclude that the carrier could avoid liability under the FIOS clause, it found that the clause created a presumption that the shipper would control "the method and purveyor of discharge." *Id* at 307. The shipper argued it was forced to choose the stevedore, but the court noted the absence of a contract provision stating the shipper could not choose its stevedore. In addition, the shipper received and accepted a rate and terms quotation from the stevedore and the shipper's own surveyor believed

---

[4] COGSA § 1304(2)(q) is a catchall exception which provides that the carrier may exonerate itself from loss from any cause other than those listed in §§ 1304(2)(a)-(p) by proving that the loss or damage occurred "without the actual fault and privity of the carrier."

[5] "'Free Out' cargo is discharged at the risk and expense of the cargo interests." *Thyssen*, 421 F3d at 297, n3.

the shipper was the only entity which could have ordered the stevedore to stop the discharge. Based on the FIOS presumption and the other evidence, the court found the carrier was not liable for cargo damage caused during discharge by a stevedore controlled by the shipper. Therefore the carrier could successfully invoke the exoneration provisions in COGSA, 46 USC app §§ 1304(2)(i) and (q) (2000). *Id*. The opinion contains no discussion of the carrier's inability to delegate the duty to discharge under COGSA.

CP Ships also cites an earlier Ninth Circuit case, *Tessler Bros. Ltd. v. ItalPacific Line*, 494 F2d 438 (9th Cir 1974), which held that a carrier can extend its own limitation of liability to independent stevedores by using a "Himalaya clause" in the bill of lading.[6] In *dicta*, *Tessler Bros.* agreed that "a carrier cannot immunize itself from responsibility for its own negligence." *Id* at 443. To the same effect is *United States v. Atlantic Mutual*, 343 US 236, 240-242 (1952), stating that carriers may not "deviate from the controlling rule that without congressional authority they cannot stipulate against their own negligence or that of their agents or servants." However, neither case discussed whether a carrier can shift responsibility for loading and unloading to the shipper and immunize itself from liability for the negligence of the shipper and its agents.

In essence, CP Ships motion poses two questions: (1) whether a carrier can delegate its duty to load and unload to the shipper under COGSA; (2) if so, whether a carrier can also delegate liability arising from loading and unloading to the shipper. As to the first question, most courts agree that a carrier *can* delegate its duty to load and unload under COGSA. Even the

---

[6] A "Himalaya clause" is an express provision in the bill of lading that extends the COGSA defenses and protections to the carrier's agents and contractors. *See Hale Container Line v. Houston Sea Packing Co.*, 137 F3d 1455, 1465 (11th Cir 1998).

13 - FINDINGS AND RECOMMENDATION

Second and Fifth Circuits, which refuse to enforce a contract provisions shifting the carrier's liability for damages for loading and unloading cargo, nevertheless allow the carriers to delegate their duties to load and/or unload the cargo and to avoid liability for damages by proving the defenses available under COGSA §§ 1304(2)(i) and (q). Therefore, this court finds the carrier's duty to load and unload can be delegated to a shipper by contract without violating COGSA.

As to the second more critical question, this court is compelled to follow the lead of the Ninth Circuit in *Atlas*. Notwithstanding the sound reasoning of the Second and Fifth Circuits in *Arktis Sky* and *Tubacex*, the controlling authority in this jurisdiction is *Atlas*. *Atlas* does not disagree with the well-established principle that liability for the carrier's own negligence or that of its agents cannot be waived by clause or contract. Instead, it stands for the proposition that a carrier can immunize itself with appropriate contract language from liability for the negligence of the shipper and its agents in loading or unloading the cargo without running afoul of COGSA.

COGSA was passed to "counteract the persistent efforts of carriers, who are the drafters of ocean bills of lading, to insert all embracing exceptions to liability" and to relieve shippers from making "a detailed study of the fine print clauses of a carrier's regular bill of lading on each occasion before shipping a package." *Tessler Bros.,* 494 F2d at 444-45 (citations omitted). However, the scenario presented by this case is quite different from the one Congress was trying to prevent. Here the shipper (CP Ships) agreed to arrange for loading and unloading the cargo and, in exchange, paid the carrier (Tidewater) the lower tariff price.[7] *Tessler Bros.* offered a public policy reason for contrasting a carrier's limitations of liability with exemptions from

---

[7] Although not made explicit in the record, the parties agreed at oral argument that the tariff price is lower than a negotiated price in a private service contract..

liability: "A limitation, unlike an exemption, does not induce negligence." *Id* at 443. The limitation in Tidewater's Freight Tariff 200-A does not present such an inducement of negligence by Tidewater where the shipper is in charge of loading and unloading the cargo.

Admittedly, unlike *Artkis Sky* and *Tubacex*, *Atlas* does not specifically discuss the interplay between COGSA § 1303(8) and the defenses available to a carrier to avoid liability under COGSA § 1304(2). However, based on the broad language in *Atlas,* this court concludes that a provision in a bill of lading which transfers liability for the negligence of the shipper and the shipper's agents in loading and unloading is valid under COGSA § 1303(8) to the extent it does not immunize the carrier from its own or its agents' negligence, failure and fault. In other words, shifting responsibility for loading and unloading from the carrier to the shipper in a bill of lading does not violate COGSA if the carrier is without actual fault. However, if the carrier is at fault for any damage caused by improper loading or unloading, then a limitation clause in the bill of lading will not relieve the carrier from liability. The party who is liable for the stevedore's negligence depends on who hired the stevedore to load/unload and who controlled the stevedore's performance.

### B. Tidewater's Liability for Loading/Unloading

It is undisputed that CP Ships hired the Port of Lewiston and the Port of Portland as stevedores to load and unload the barge. If CP Ships also controlled the stevedores, then under the Bill of Lading, Tidewater is not responsible for the negligence of the Port of Lewiston and the Port of Portland, if any, in loading and unloading the barge.

However, the parties disagree whether Tidewater controlled the stevedores and, therefore, was guilty of its own negligence, fault or failure in connection with the loading or unloading.

15 - FINDINGS AND RECOMMENDATION

CP Ships argues that Tidewater exercised control during the loading process because it gave specific loading instructions and parameters to the Port of Lewiston for securing of containers; it provided cones to the Port of Lewiston for securing the containers; its captain accepted the load; and it bore responsibility for the BIG BIN while it was moored at the Port of Portland.

Resolution of this dispute rests on issues of fact that must be resolved at trial. Should Tidewater be found negligent in any way in connection with the loading and/or unloading of the BIG BIN, then it cannot escape liability for that negligence under its bill of lading.

### C. Damages Not Covered by COGSA

Tidewater makes an alternative argument that if its Tariff violates COGSA, then some damages alleged in its First Claim for Relief are not covered by COGSA § 1303(8). That section only applies to "liability for loss or damage *to or in connection with the goods*." *Id* (emphasis added). Therefore, Tidewater concludes that COGSA § 1303(8) only applies to direct and incidental damages to cargo, and not to consequential damages such as damage to the BIG BIN, damage to the Port of Portland's dock, structure and berth, and expenses Tidewater incurred to retrieve and dispose of the containers and their contents.

In support of this contention, Tidewater cites *Stainless Steel & Metal Mfg. Corp. v. Sacal V.I., Inc.*, 452 F Supp 1073, 1082 (D PR 1978). In *Sacal*, the carrier's agents negligently discharged the cargo, causing the cargo (in that case, a motor crane) to fall against the dock. COGSA was incorporated by reference in the bill of lading. The shipper did not request compensation for damage to the crane itself. Instead, it sued the carrier to recover for losses caused by not being able to use the crane for a day, the loss of a contract, work penalties, the

rental of an additional crane and other costs incurred because of the delay. The court found that such damages were of a consequential nature and not recoverable under COGSA.

Tidewater concludes that based on *Sacal*, any reading of COGSA § 1303(8) would exclude the damages to the BIG BIN and the Port of Portland's dock and structure from the purview of that section. Thus, Tidewater argues that COGSA does not bar Tidewater through its Tariff from shifting liability for those consequential damages to CP Ships.

CP Ships rejects a literal reading of COGSA § 1303(8) and cites numerous cases for the proposition that carriers cannot stipulate against their own negligence or that of their agents and servants. See *Atlantic, Tessler Bros., supra; also see Bisso v. Inland Waterways Corp.*, 349 US 85 (1955) (invalidating exculpatory provision in towage contract). However, none of these cases discusses whether COGSA covers consequential damages.

Having decided that under COGSA, a bill of lading may transfer liability from the carrier to the shipper for *any* damage (not just cargo damages) arising from the shipper's negligence, this court need not reach the question whether COGSA covers consequential damages to non-cargo.

## RECOMMENDATION

Based on the foregoing, CP Ships' Motion for Judgment on the Pleadings and alternate Motion for Summary Judgment (docket #147), joined in by the Port of Portland and Marine Terminals Corporation (docket #185), should be DENIED.

## SCHEDULING ORDER

Objections to the Findings and Recommendation, if any, are due December 19, 2005. If no objections are filed, then the Findings and Recommendation will be referred to a district court judge and go under advisement on that date.

17 - FINDINGS AND RECOMMENDATION

If objections are filed, then a response is due within 10 days after being served with a copy of the objections. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will be referred to a district court judge and go under advisement.

DATED this 30th day of November, 2005.

s/ Janice M. Stewart_____
Janice M. Stewart
United States Magistrate Judge